Steven L. Opat Geary County Counselor Geary County Attorney 801 North Washington Street, Suite A Junction City, Kansas 66441
Dear Mr. Opat:
In your capacities as Geary County Counselor and as Geary County Attorney, you pose a number of questions that pertain to F R Swine, Inc., a swine production facility, in relation to the Kansas Agricultural Corporations Act (Act), K.S.A. 17-5903 et seq. You inform us that F R Swine, Inc. is a Kansas corporation initially formed and registered with the Secretary of State in 1974, and "merged" in 2001. You also advise that "over the vociferous objection" of F R Swine's neighbors, the Kansas Department of Health and Environment recently granted a permit for the addition of a waste storage pond to the existing facility. Due to this action, issues have been raised regarding the applicability of the Act which, with a number of exemptions, prohibits corporations and other business entities from directly or indirectly owning, acquiring, otherwise obtaining or leasing any agricultural land in Kansas.
You ask first whether K.S.A. 17-5904(c) is mandatory or permissive and, given the civil nature of such a proceeding, whether the Board of County Commissioners (board) determines if a violation of the Act should be pursued.
K.S.A. 2006 Supp. 17-5904(c), the enforcement provision of the Act, provides that a corporation or other specified business entity that violates the provisions of the Act "shall be subject to a civil penalty of not more than $50,000 and shall divest itself of any land acquired in violation [of the Act] . . . within one year after judgment is entered in the action." The section further provides "[t]he attorney general or district or county attorney shall institute suits on behalf of the state to enforce the provisions of this section."
You advise that you serve in the dual capacities of Geary County counselor to the Geary County Commission, as well as Geary County attorney. In relation to these dual roles, K.S.A. 2006 Supp. 17-5904(c) places the responsibility for instituting suits to enforce violations of the Act with the county attorney. Thus, any decision regarding the initiation of an enforcement action rests with you as county attorney not as county counselor to the Geary County Commission or with the Commission itself.
As to whether K.S.A. 2006 Supp. 17-5904(c) is mandatory or directory, the rules and aids of construction for interpreting whether a statute is mandatory or directory were summed up in State v. Residential Unit Real Estate at 930 Windwood No. 2, Junction City, Kansas[1] citingWilcox v. Billings:[2]
 "When ascertaining legislative intent, the general rule is that the entire statute, including its nature, object, and the consequences which result from either construction, is to be considered. A statutory provision is regarded as directory if it relates to some immaterial matter, such as where compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute merely give a view to the proper, orderly, and prompt conduct of business, unless followed by words of absolute prohibition. A statutory provision is also regarded as directory if no substantial rights depend on it, no injury can result from ignoring it, and the purpose of the legislature can be accomplished in a manner other than that prescribed, with substantially the same results.
 "A statutory provision is considered mandatory if it is the essence of the thing to be done to matters of substance. When a statute directs acts or proceedings to be done in a certain way, it shows the legislature's intent that compliance with the provision is essential to the validity of the act or proceeding. A statute is also regarded as mandatory if some antecedent and prerequisite conditions must exist prior to the exercise of power or must be performed before certain other powers can be exercised."
In our opinion, K.S.A. 2006 Supp. 17-5904(c) is directory, giving a view to the proper, orderly and prompt conduct of business by authorizing a county attorney, district attorney or the attorney general to initiate an action pursuant to the Act. Additionally, the statute establishes a matter of convenience rather than substance, has no words of absolute prohibition and does not provide a penalty for noncompliance. We are also of the opinion that, similar to a prosecutor's decision whether to initiate a criminal action, the decision whether to initiate an enforcement action under the Act is likewise, a matter of "prosecutorial" discretion.[3]
You next inquire: "If the county attorney is not `qualified' (by reason of time constraints, expertise and/or conflict because of advice given to the Board of County Commissioners as counselor) to pursue such action, what recourse does the Board . . . have?"
Again, the decision whether to bring an enforcement action lies with the county attorney (or district attorney or attorney general). However, the Board may utilize K.S.A. 19-723 should a county attorney not consider himself "qualified" under the circumstances you cite. That statute provides:
 "That when, in the judgment of the board of county commissioners of any county in this state, it becomes necessary or expedient, the said board of county commissioners may employ an additional attorney at law to assist the county attorney of its county in any specific investigation, prosecution or any civil or criminal matter involving the duties of said county attorney, and the said board of county commissioners may pay such attorney so employed reasonable compensation for his services, the same to be charged to the general fund of said county."[4]
If, in your professional opinion as county attorney, an enforcement action is warranted and you determine that you are not "qualified" to bring such an action, a request for an additional attorney would be in order.
We note that in relation to this statute, former Attorney General Stephan opined that "K.S.A. 19-723, which authorizes the board of county commissioners to employ an additional attorney to assist the county attorney, involves a discretionary power held by the board and does not mandate such special assistant be employed."[5]
Alternatively, a county attorney may request that the attorney general evaluate any given situation under the Act with an eye towards consideration of bringing an enforcement action.[6]
Your next question is: "Since the corporation in question has owned the property upon which the operation is based since 1974, before the passage of K.S.A. 17-5904 in 1981, are K.S.A. 17-5904(c), the enforcement mechanism that subjects corporate violators to a civil penalty of up to $50,000, and K.S.A. 17-5908, the process by which voters may approve a swine production facility, applicable?"
Before addressing this question, a history of the regulation of swine operations will put this matter in historical context.
 "As early as 1931, Kansas regulated corporate agriculture within the state. Kansas law prohibited corporations from engaging `in the agricultural or horticultural business of producing, planting, raising, harvesting or gathering wheat, corn, barley, oats, rye or potatoes, or the milking of cows for dairy purposes.' Kansas' first statute prevented corporations from engaging in what is a relatively narrow aspect of present day agriculture. Obviously, this statute would not prevent corporations from engaging in large-scale confined feeding facilities. In 1981, the Kansas Legislature enacted farm legislation which covered a broader range of agricultural activities and prohibited corporate hog farming. This statute made it a violation of state law for corporations (and related business associations) to `directly or indirectly own, acquire or otherwise obtain or lease any agricultural land in this state.' After establishing this broad ban on corporate ownership of agricultural land, the legislature then created exceptions for certain types of businesses. This statute did not allow for corporate hog farms to operate within the State of Kansas. However, in 1994 the Kansas Legislature adopted legislation that opened the door for corporations to operate hog facilities within the state. This statute allowed for each county to determine whether it would allow corporately owned swine production facilities to operate with the county."[7]
Debate about the regulation of corporate hog farming continued even after 1994, culminating in 1998 with the passage of L. 1998, ch. 143,[8] a comprehensive statutory scheme addressing soil and waste pollution associated with confined animal feeding operations.
With this history in mind, we return to your question. K.S.A. 2006 Supp. 17-5908 establishes the procedure by which qualified voters of a county decide whether to allow swine production facilities within the county. That statute was initially passed in 1994,[9] and amended into its current form in 1998.[10] In order to answer your question, K.S.A. 2006 Supp. 17-5908 must be read in conjunction with K.S.A. 2006 Supp.17-5904(a)(15), also enacted in 1998 as a part of the comprehensive legislation[11]:
 "The restrictions [against corporate farming] . . . do not apply to the following:
 . . . .
 "Except as provided by K.S.A. 17-5908, as it existed before the effective date of this act, and K.S.A. 1998 Supp. 17-5909, agricultural land held or leased by a corporation or a limited liability company for use as a swine production facility in any county which, before the effective date of this act, has voted favorably pursuant to K.S.A. 17-5908, as it existed before the effective date of this act, either by county resolution or by the electorate."
Deconstructing this confusing subsection, the first element to understand is that "this act" refers to the 1998 Comprehensive Confined Animal Feeding Operations Act.[12] The phrase "K.S.A. 17-5808, as it existed before the effective date of this act" thus refers to the 1994 version of K.S.A. 17-5908,[13] which for the first time in the history of the Act specifically allowed the operation of corporate hog facilities in Kansas[14] — assuming a county had followed the then applicable procedure.[15]
The second element to understand is the reference to "K.S.A. 1998 Supp. 17-5909." That statute, also passed in 1998,[16] allowed county voters to rescind a resolution formerly passed allowing a swine production facility to operate. However, that statute expired by its own terms on December 31, 1998.[17]
Thus, reconstructing K.S.A. 2006 Supp. 17-5904(a)(15), it would read:
The restrictions [against corporate farming] provided in this section do not apply to the following: . . .
Except as provided by the 1994 version of K.S.A. 17-5808, agricultural land held or leased by a corporation or a limited liability company for use as a swine production facility in any county which, before 1998, has voted favorably pursuant to the 1994 version of K.S.A. 17-5808, either by county resolution or by the electorate.
The same may also be phrased in a manner more easily understood as:
Corporate farming restrictions do not apply if the county in which the swine production facility is operating held an election before 1998 wherein the electorate voted favorably on the question of whether to allow the operation of a corporate swine production facility.
Your opinion request letter informs us that "there is no evidence that there has ever been any action taken pursuant to K.S.A. 17-5908," presumably in its current or former version.
Thus, in response to your question, the fact that the corporation has owned the property upon which the operation has been based since 1974, which was prior to the passage of the 1981 Agricultural Corporations Act, does not affect the applicability of K.S.A. 2006 Supp. 17-5904 and K.S.A. 2006 Supp. 17-5908.
Lastly, you ask whether the "merger" of the corporation in 2001 subjects the corporation to the strictures of K.S.A. 2006 Supp.17-5904(c) and K.S.A. 2006 Supp. 17-5908.
As we understand it, in 2001 the domestic corporation F R Swine, Inc., merged into a separate domestic corporation, Swine, Inc., with Swine, Inc. becoming the surviving corporation. However, at the same time Swine, Inc. changed its corporate name to F R Swine. Under Kansas law, with this merger the existence of the original F R Swine, Inc. ceased.[18] In response to your question, the surviving corporate entity (also called F R Swine, Inc.) then became a subject to the strictures of K.S.A. 2006 Supp. 17-5904(c) and K.S.A. 2006 Supp. 17-5908
as had the ceased corporation.
However, despite the preceding discussion, we hasten to add that K.S.A. 2006 Supp. 17-5904 excludes certain business entities[19] from the corporate (and other business entities) farm prohibition altogether; and that K.S.A. 2006 Supp. 17-5904 lists 18 specific exemptions to the otherwise applicable prohibition against corporate (and other business entities) farming, some of which may be applicable to the situation in Geary County. However, in this opinion we have not analyzed, and therefore offer no opinion, as to the applicability of any of these exemptions other than K.S.A. 2006 Supp. 17-5904(a)(15).
Summarizing, any decision regarding the initiation of an enforcement action of the Kansas Agricultural Corporations Act rests with the county attorney. The enforcement provision of the Act, K.S.A. 2006 Supp.17-5904(c), is directory, giving a view to the proper, orderly and prompt conduct of business by authorizing only a county attorney, district attorney and the attorney general.
If, an enforcement action is warranted and the county attorney determines that he is not "qualified" to bring such an action, a request to the board of county commissioners for a special prosecutor is appropriate pursuant to K.S.A. 19-723. This statute, which authorizes the board of county commissioners to employ an additional attorney to assist the county attorney, involves a discretionary power held by the board and does not mandate that such special assistant be employed. Alternatively, a county attorney may request that the Attorney General evaluate any given situation under the Act with an eye towards bringing an enforcement action.
When one corporation is merged into another corporation, the corporate existence of the former ceases with the latter becoming the surviving corporation. Under the facts presented, that surviving corporation is subject to the strictures of K.S.A. 2006 Supp. 17-5904(c) and K.S.A. 2006 Supp. 17-5908. However, this opinion does not evaluate whether other exemptions to the otherwise applicable prohibition against corporate farming are applicable.
Sincerely,
 Paul J. Morrison Attorney General
 Camille Nohe Assistant Attorney General
PJM:MF:CN:jm
[1] 26 Kan.App.2d 260, 262 (1999).
[2] 200 Kan. 654, 657-58 (1968).
[3] "The discretion whether or not to prosecute has long been the sacred domain of the prosecutor and stems from the common-law practice of nolle prosequi. A nolle prosequi is a formal entry of record by the prosecuting attorney by which the prosecutor declares an unwillingness to prosecute a case or that he or she will not prosecute a suit further. (Citation omitted). It has generally been held thatin the absence of a controlling statute or rule of court, the power to enter a nolleprosequi before the jury is empaneled and sworn lies in the sole discretion of the prosecuting officer. (Citation omitted)." State v.Ji, 251 Kan. 3, 11 (1992).
[4] Emphasis added.
[5] Attorney General Opinion No. 81-81. See also State v.Rollins, 24 Kan.App.2d 15, 21 (1997).
[6] K.S.A. 2006 Supp. 17-5904(c).
[7] Mullin, Old McDonald Had aGovernment-Regulated-Confined-Swine-Operating; A Substitute for H.B.2950, 38 W.L.J. 655, 656-658 (1999).
[8] Formerly 1998 Subst. for H.B. 2950.
[9] L. 1994, ch. 130, § 1.
[10] L. 1998, ch. 143, § 45.
[11] L. 1998, ch. 143, § 44.
[12] L. 1998, ch. 143.
[13] L. 1994, ch. 130, § 1.
[14] "The restrictions provided in this section [against corporate and other business entity farming] do no apply to the following: [Except] as provided by section 1 [the section which became K.S.A. 17-5808], agricultural land held or leased by a corporation or a limited liability company for use as a swine production facility, in any county which has voted favorably pursuant to section 1, either by county resolution or by the electorate." L. 1994, ch. 130, § 4(a)(15).
[15] Under L. 1994, ch. 130, § 1, two procedures were available. First, the Board of County Commissioners could adopt a resolution, subject to notice and protest petition, to permit the establishment of corporate swine production. Second, voters in a county could submit a petition to the Board requesting the establishment of a corporate swine production facility in the county. Both the protest petition in the first method and the voter petition in the second method required the signatures of 5% of the voters in the last preceding general election for the Secretary of State.
[16] L. 1998, ch. 143, § 38.
[17] L. 1998, ch. 143, § 38(d).
[18] K.S.A. 1006 Supp. 17-6709.
[19] Family farm corporation, authorized farm corporation, limited liability agricultural company, family farm limited liability agricultural company, limited agricultural partnership, family trust, authorized trust and testamentary trust.